* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission modifies the Opinion and Award of Deputy Commissioner Griffin with regards to compliance with vocational rehabilitation and the provision of medical treatment.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers' Compensation Act.
4. An employment relationship existed between plaintiff and defendant-employer on August 2, 2000.
5. The North Carolina Insurance Guaranty Association is on the risk in the place of Reliance Insurance Company.
6. That the date of the alleged injury is August 2, 2000.
7. Plaintiff's average weekly wage is $353.69, with a compensation rate of $235.80.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff sustained a compensable injury by accident to his neck on August 2, 2000 that was accepted by defendants through a Form 60 dated September 22, 2000. Defendants continue to pay temporary total disability benefits at a rate of $235.80 per week.
2. After plaintiff's injury, he treated with Dr. Henry J. Elsner of Guilford Neurosurgical Associates. Dr. Elsner performed surgery on the plaintiff on January 30, 2001, consisting of a diskectomy with insertion of a titanium plate at levels C5-6 and C6-7. *Page 3 
3. Thereafter, plaintiff treated with Dr. Albert Bartko of Guilford Orthopaedic and Sports Medicine and on September 7, 2001, Dr. Bartko placed plaintiff at maximum medical improvement (MMI). Dr. Bartko assigned a 20% permanent partial disability rating to plaintiff's neck.
4. Plaintiff then began treatment with Dr. Hans Hansen, a pain management doctor. A positive physician-patient relationship did not develop and Dr. Hansen ultimately stopped treating plaintiff.
5. Defendants filed a Motion to Compel Compliance with Vocational Rehabilitation on July 24, 2002. By Administrative Order filed on October 17, 2002, Executive Secretary Tracey H. Weaver ordered plaintiff to comply with future reasonable vocational rehabilitation services provided by defendants pursuant to N.C. Gen. Stat. § 97-25.
6. On January 29, 2004 Deputy Commissioner Bradley W. Houser entered an Opinion and Award authorizing Dr. Jeffrey Hooper as plaintiff's primary treating physician and further ordering that Dr. Hooper shall determine what medical care is reasonable and necessary to effect a cure or provide relief. Subsequently, Dr. Hooper's medical license was suspended.
7. Plaintiff began treatment with Dr. Mark Phillips, a pain management specialist, on May 24, 2004. Dr. Phillips ordered a functional capacity evaluation (FCE). Plaintiff saw Nathan Andrew Graham, an Industrial Rehabilitation Coordinator with Guilford Orthopedic Specialists Rehabilitative Center, for the FCE on February 22, 2005.
8. Mr. Graham found that plaintiff demonstrated a very high level of effort and determined that plaintiff would be capable of working at the heavy physical demand classification level. *Page 4 
9. Plaintiff called Mr. Graham on March 1, 2005 regarding the FCE. Mr. Graham testified that he believed plaintiff's intention for calling was two-fold. He felt that plaintiff called to let him know his pain had gone back up and that the pain medication he was taking, or knew would help, was not available to him. Plaintiff indicated to Mr. Graham that he was unhappy with Dr. Phillips because Dr. Phillips was not giving him the medication he needed and that he had fired other physicians and would fire Dr. Phillips if he did not do what he wanted. Mr. Graham was of the opinion that the telephone conversation with plaintiff was out of the ordinary and that plaintiff was upset and frustrated. Mr. Graham documented the call because he believed the information would be relevant to Dr. Phillips in treating plaintiff and to appropriately show plaintiff's emotional state. Plaintiff was crying during portions of the telephone conversation. Based upon plaintiff's emotional state, Mr. Graham felt it was ethical and appropriate to make sure plaintiff did not have any thoughts of harming himself. The March 1, 2005 telephone call lasted approximately fifty-four minutes.
10. Mr. Graham sent a letter to Dr. Phillips documenting his conversation with plaintiff. In a letter dated March 11, 2005, Dr. Phillips advised plaintiff that he was discharging him from his care and further stating that plaintiff had no confidence in the care being given.
11. Debbie Wright, a rehabilitation professional with Armstrong 
Associates, was assigned on February 24, 2004 to provide medical case management for plaintiff. Ms. Wright recommended that plaintiff see Dr. Del Curling. Ms. Wright indicated that when she has a client who has been seen by many different physicians and who feels frustrated, like they have not gotten what they need, she uses Dr. Curling, especially if it is a neurosurgical-type situation. Dr. Curling's specialty is neurosurgery, but he no longer performs surgery. Dr. Curling performs independent medical evaluations (IME's) and did so with plaintiff on May 18, 2005, after *Page 5 
plaintiff had been discharged from Dr. Phillips' care. Dr. Curling indicated that plaintiff had symptoms of classic ulnar palsy, which was not uncommon after decompression at C-7. Dr. Curling recommended an EMG/nerve conduction test. If the nerve conduction test indicated surgery was not necessary, Dr. Curling would suggest pain management. Plaintiff's nerve conduction test was normal. Dr. Curling found plaintiff to be at MMI and indicated that no further major tests or treatment were needed. Dr. Curling assigned medium-level work restrictions and assigned a 15% permanent partial disability rating to plaintiff's spine.
12. Dr. Curling recommended Dr. Gregory Crisp as a pain management physician for Plaintiff. Dr. Crisp is board certified in pain management and works at Alamance Regional Medical Center. Dr. Crisp's initial evaluation of plaintiff was on July 19, 2005. It was Dr. Crisp's assessment that plaintiff had pain involving the cervical and upper extremity region predominantly. Dr. Crisp informed plaintiff that they might consider radio frequency, the spinal cord stimulator or another form of stimulation, medications, and a psychological evaluation. Plaintiff was scheduled to see Dr. Crisp's associate, Dr. Naveira, to discuss the spinal cord stimulator. Plaintiff was given a brochure about the spinal cord stimulator at the July 19, 2005 appointment. On July 29, 2005, plaintiff contacted Debbie Wright, telling her he did not want the spinal cord stimulator and that he did not want to see Dr. Naveira; he wanted to see Dr. Crisp again.
13. Plaintiff saw Dr. Crisp again on August 2, 2005. Dr. Crisp described plaintiff's behavior as bizarre. Plaintiff told the nurse who evaluated him that he could take her out with one blow. Plaintiff also grabbed Dr. Crisp by his pants and demonstrated how he was going to stabilize Dr. Crisp's leg to give him an injection of epinephrine. Plaintiff was recounting a story about how he saved a man's life. Plaintiff also demonstrated tae kwon do movements for Dr. *Page 6 
Crisp. Dr. Crisp described the movements as being so close to his face he could feel the wind from plaintiff's motions. Plaintiff's behavior at the August 2, 2005 appointment raised concerns for Dr. Crisp and he discharged plaintiff from his care.
14. Dr. Crisp was of the opinion that plaintiff needed a psychological evaluation because of his behavior. He stated that patients receiving treatment for pain management frequently also need psychological counseling as part of the pain management treatment.
15. Plaintiff voiced concerns about Dr. Crisp and was referred to patient relations at Alamance Regional Medical Center. Plaintiff spoke with Betty Kluttz in patient relations. Ms. Kluttz described plaintiff as being angry when he entered the department. He complained that Dr. Crisp refused to provide pain medications. He also complained about Dr. Crisp's recommendation to surgically implant the spinal cord stimulator. Plaintiff described his neck surgery to Ms. Kluttz and put his hand on her throat to demonstrate how Dr. Elsner performed his surgery. Plaintiff also placed his TENS unit on Ms. Kluttz's wrist. Ms. Kluttz described plaintiff's behavior as extremely bizarre, very aggressive, confrontational, and belligerent.
16. Debbie Wright, plaintiff's medical case management nurse, decided to close his file on August 4, 2005. Ms. Wright was aware of what transpired with plaintiff and Ms. Kluttz. In addition, Ms. Wright felt she had done all she could for plaintiff. He had been taken to several reputable physicians and was not satisfied. She felt she did not have anything left to offer plaintiff and that there was a potential danger of physical harm from plaintiff. Ms. Wright testified that plaintiff would call her on the phone and curse at her. She requested that plaintiff not contact her by telephone and in a letter dated August 5, 2005, she requested that plaintiff not contact her or the main office of Armstrong Associates. *Page 7 
17. Plaintiff first saw Dr. James Adelman of the Headache Wellness Center for treatment of his headaches on May 7, 2004. Plaintiff described his headaches as beginning on the right side, mostly in the neck region and coming forward. Dr. Adelman diagnosed plaintiff as having headaches related to cervical spine disease, occipital neuralgia, and migranes. Dr. Adelman opined that plaintiff's headaches were caused by his cervical spine injury and surgery, and that the cervical spine problem makes it more likely he will have headaches and makes the headaches more difficult to control. Dr. Adelman believed it would be a good idea for plaintiff to work and that disability for plaintiff's situation would be unusual. Dr. Adelman testified that plaintiff used inappropriate language with his staff and displayed periods of abrupt behavior. Dr. Adelman confronted plaintiff about his behavior and plaintiff's behavior improved. As of November 11, 2004, Dr. Adelman opined that plaintiff was at maximum medical improvement from a headache perspective and could return to work. On April 12, 2005, Dr. Adelman reiterated his opinion that plaintiff was not disabled from returning to work due to his headaches.
18. After being discharged from treatment with Drs. Phillips and Crisp, plaintiff sought treatment without prior approval or authorization from defendants with Dr. Jerome Davis of Battleground Urgent Care beginning on August 22, 2005. Plaintiff's complaints were of chronic neck pain and right upper extremity pain. Dr. Davis ordered an MRI of plaintiff's neck. The MRI was done on August 28, 2005 and the MRI indicated mild, in-place spurring. Dr. Davis wrote notes dated September 8, 2005, September 10, 2005, and September 22, 2005 stating plaintiff was unable to work. Dr. Davis referred plaintiff to a pain management specialist. Dr. Davis did not review the FCE ordered by Dr. Phillips and was unaware of the treatment plaintiff had received from Dr. Curling, Dr. Crisp, Dr. Adelman, Dr. Bartko, or Dr. Hansen. Plaintiff paid for his visits with Dr. Davis and the medications prescribed by Dr. Davis out-of- *Page 8 
pocket. Dr. Davis is not an authorized treating physician and defendants are not responsible for paying any treatment plaintiff received from Dr. Davis.
19. The Full Commission finds that the opinion of Dr. Davis that plaintiff is unable to work is contradicted by the greater weight of the credible evidence, including an FCE indicating plaintiff was capable of heavy duty work and the opinions of Drs. Bartko, Phillips, Curling and Adelman.
20. Bernard Moore of Dove Vocational Rehab was plaintiff's assigned vocational rehabilitation professional. Mr. Moore initially attempted to meet with plaintiff in September 2003. After several unsuccessful attempts, he closed the file in January 2004. Plaintiff's file was re-opened on August 2, 2005. Mr. Moore's initial meeting with plaintiff was September 13, 2005. Mr. Moore performed a vocational assessment and identified jobs he felt plaintiff was capable of performing based upon a review of the medical records and restrictions assigned by the various treating physicians and the FCE. Mr. Moore indicated that plaintiff only followed up on one job lead out of approximately 25 and did not perform any independent job searches as requested. Plaintiff cancelled all four meetings with Mr. Moore during the month of December 2005. Plaintiff testified that he did not follow up on the job leads because he did not believe he was at MMI. Mr. Moore received Dr. Davis' notes indicating plaintiff could not work but explained to plaintiff that he could not honor the notes because Dr. Davis was not the authorized treating physician of record. Mr. Moore last met with plaintiff on January 16, 2006 and made several attempts after that to meet with plaintiff but plaintiff cancelled each meeting. At the request of the NC Guaranty Association, Mr. Moore put plaintiff's file on hold on March 13, 2006. *Page 9 
21. Plaintiff has not been cooperative with vocational rehabilitation as ordered by Executive Secretary Tracey H. Weaver on October 17, 2002.
22. The Full Commission finds by the greater weight of the credible evidence that plaintiff has reached maximum medical improvement and is capable of performing work in accordance with the Functional Capacity Evaluation.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On August 2, 2000, plaintiff, while working for defendant-employer, sustained an admittedly compensable injury by accident arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has unjustifiably refused to comply with vocational rehabilitation as ordered by Executive Secretary Tracey H. Weaver. As such, plaintiff's temporary total disability benefits are hereby suspended until plaintiff demonstrates full compliance with the Order filed on October 17, 2002. N.C. Gen. Stat. § 97-25; Maynor v. SaylesBiltmore Bleacheries, 116 N.C. App. 485, 448 S.E.2d 382 (1994).
3. Defendants shall authorize and pay for all reasonable medical treatment as may be required to effect a cure or give relief or which tends to lessen the period of disability. Defendants are not required to reimburse plaintiff for the treatment he sought with Dr. Davis and Dr. Davis is not an authorized treating physician. N.C. Gen. Stat. §§97-2(19), 97-25, and 97-25.1.
 * * * * * * * * * * * *Page 10 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 ORDER
1. Plaintiff's temporary total disability benefits are hereby suspended as of the date of the filing of this Opinion and Award until plaintiff demonstrates full compliance with all reasonable vocational rehabilitation efforts provided by defendants.
2. Industrial Commission Nurse Emily McKinney is hereby designated to assist in this matter. The parties are hereby ORDERED to confer with each other and Ms. McKinney to select a comprehensive pain management program for plaintiff to participate in and a new treating physician.
3. Under N.C. Gen. Stat. § 97-25, defendants have the right to direct medical treatment. Plaintiff is hereby ORDERED to cooperate with all reasonable and prescribed medical and rehabilitative treatment as provided by defendants. N.C. Gen. Stat. § 97-25. Refusal to comply with this Order shall bar plaintiff from further compensation until such refusal ceases unless, in the opinion of the Industrial Commission, the circumstances justified the refusal. The parties are urged to work together to come to a suitable agreement regarding plaintiff's further medical treatment
4. Plaintiff's Motion for Contempt is hereby DENIED. Plaintiff may re-file his Motion for Contempt with the Chair of this Panel but it should be in accordance with Chapter 5A, Article 2 of the North Carolina General Statues.
5. Defendants shall pay the costs.
 This the 9th day of August, 2007. *Page 11 
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1